LANDRY, Judge.
Plaintiff, John H. Sylvester, instituted this action against his employer, Offshore Food Service, Inc. (Offshore), and Offshore’s insurer, Aetna Casualty and Surety Company (Aetna), under general maritime law, seeking recovery of “maintenance and cure” allegedly due because of a reputed back injury sustained while performing janitorial or steward helper’s service aboard a vessel belonging to Offshore. From a judgment awarding plaintiff maintenance and cure at the rate of $8.00 daily from December 24, 1965 (three days following the averred accident of December 21, 1965), until the date of trial, June 21, 1967, and thereafter until plaintiff shall have attained maximum cure, together with attorney’s fees of $2,700.00 and interest and costs, Offshore and Aetna have appealed. We find the trial court has properly resolved all issues presented and affirm the decree rendered below.
Our jurisdiction of this cause is derived from the Federal Constitution and those statutes emanating from the Judiciary Act of 1789, more particularly, 28 U.S.C.A. Sec. 1333, which confers upon United States District Courts exclusive original jurisdiction of civil causes of admiralty and maritime jurisdiction, saving to suitors “all other remedies to which they are otherwise entitled.” Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239.
*432 Considering this action is in personam, we are authorized to adjudicate the matter subject to the mandatory duty of applying and complying with “substantive maritime law.” Madruga v. Superior Court, 346 U.S. 556, 74 S.Ct. 298, 98 L.Ed. 290, and authorities cited therein.
Plaintiff, a farmer residing in Washington, St. Landry Parish, frequently accepted outside employment during “slack seasons” to augment his income. Offshore is a marine catering company which provides food, catering service and housekeeping personnel to vessels used as living quarters for offshore drilling platform crews. On December 18, 1965, without being required to undergo prior physical examination, plaintiff was engaged by Offshore in the capacity of “steward helper” or janit.or aboard the quarter boat or tender Kerr-McGee No. 4, which vessel was then moored to an oil drilling rig located in the Gulf of Mexico some 70 miles south of Grand Isle, Jefferson Parish. Said vessel provided living and dining quarters for the crew which operated and serviced the aforementioned drilling platform. Plaintiff’s contract called for a tour of duty or shift of 14 days aboard the vessel followed by seven days off for rest and attention to personal affairs. The exact nature of plaintiff’s duties were to make beds, do general cleaning and render the chefs such assistance as possible in and about the kitchen and dining areas.
Plaintiff maintains that on December 21, 1965, while making up an upper bunk, he was “lurched” into an awkward position by the sudden rocking of the quarter boat, which incident “twisted” his back. He further claims to have experienced a simultaneous “warm” feeling in his lower back which sensation radiated into his right hip and leg. Essentially plaintiff maintains he felt the incident was a recurrence of a known but dormant arthritic condition which he attempted to ignore. However, according to plaintiff, the back pain grew progressively more intense until it became evident he could not continue his work. He notified his immediate superior and on December 23, 1965, was taken ashore from whence he proceeded to his home. The following day he consulted his family physician who diagnosed plaintiff’s condition as a ruptured intervertebral disc and prescribed certain treatment which in a few days caused the pain to subside. Upon the advice of his physician that plaintiff attempt to resume work, plaintiff contacted his employer by telephone and was directed to report to Offshore’s company physician for physical examination. On January 7, 1966, plaintiff was examined by Dr. Roy St. Martin to whom he was referred by Offshore’s personnel department. Plaintiff did not mention his “accident” and previous discomfort to Dr. St. Martin but did inform the doctor that plaintiff had experienced occasional arthritis in his legs. Dr, St. Martin approved plaintiff for employment and plaintiff resumed his duties that same day. Almost immediately plaintiff’s back pain returned and grew steadily worse with exertion. By January 11, 1966 plaintiff’s symptoms were so severe he was unable to properly perform his duties and returned to his home on that date. Plaintiff again consulted his local physician who continued the course of treatment initially prescribed. It developed that normal medication would not alleviate plaintiff’s suffering and at this point plaintiff was referred to a specialist. Since that time plaintiff has been seen by three specialists and has been under intermittent treatment by his local physician. Plaintiff’s position is that he is disabled by a back injury consisting of a ruptured intervertebral disc.
Defendants’ contentions are: (1) No accident, illness or injury occurred during or resulted from plaintiff’s employment by Offshore. Rather, according to defendants, plaintiff is simply suffering from the effects of pre-existing arthritis which condition does not entitle him to maintenance and cure; (2) If plaintiff is suffering from any disability, it predated his employment by Offshore and plaintiff’s alleged willful concealment thereof from Offshore *433 renders plaintiff ineligible for maintenance and cure benefits; (3) The amount and duration of the award is excessive and should be reduced to a sum less than $8.00 daily and terminated not later than August, 1965, during which month plaintiff’s alleged disability ceased; (4) Plaintiff is precluded from receipt of the benefits sought because he failed to mitigate his damages in that he did not exercise due diligence in seeking medical treatment for his alleged injuries, and (5) Attorney’s fees are not recoverable because, under the circumstances defendants acted reasonably in declining to pay maintenance and cure.
The issues thus presented must be resolved in the light of certain firmly established principles concerning which there can be little dispute. Historically, a seaman is entitled to the funds or facilities necessary for his maintenance and cure from his employer while he is unable to work due to injury or illness arising while he was engaged in the service of his ship. Said right is not dependent upon statutory law for its enforcement. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Garrett v. Moore-McCormack Co., supra. An enlightening discussion of the subject matter appears in Dragich v. Strika, 9 Cir., 309 F.2d 161, 3 A.L.R.3d 1077, from which we quote the following:
“(1, 2) There is of course no dispute with the general rule that a seaman who falls ill while in the service of his vessel is entitled to wages, maintenance and cure. This obligation of the ship-owner is deeply rooted in centuries of maritime law, and is considered to be an incident of or an implied provision of contracts of maritime employment. See generally Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1937), and Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).
(3, 4) The obligation is not related in any way to negligence or fault of the shipowner, nor is it limited to cases where the seaman’s employment is the ‘cause’ of the illness. Calmar S. S. Corp. v. Taylor, supra, 303 U.S. at 527, 58 S.Ct. 651. Typically, admiralty courts have given liberal interpretation to the obligation for the protection of seamen who are considered, in a sense, wards of the court. As the Supreme Court pointed out in Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1942), the obligation of the ship-owner to provide maintenance and cure is among the most pervasive and should not be hampered by restrictive distinctions which would defeat its broad beneficial purposes. Thus even in cases where the Libelant was suffering from a pre-exist-ing illness, the courts have granted maintenance and cure unless it could be shown that the seaman knowingly or fraudulently concealed the illness from the shipowner. Couts v. Erickson, 241 F.2d 499 (5th Cir.1957); Rosenquist v. Isthmian S. S. Co., 205 F.2d 486 (2d Cir.1953); Lipscomb v. Groves, 187 F.2d 40 (3rd Cir.1951); Ahmed v. United States, 177 F.2d 898 (2d Cir.1949); and Fish v. Richfield Oil Corp., 178 F.Supp. 750 (S.D.Cal.1959).”
Unlike workmen’s compensation statutes, a seaman is not required to establish that his disability occurred as the result of an employment related accident to be entitled to maintenance and cure. On the contrary, the concept of maintenance and cure is not related to the underlying theory of workmen’s compensation in that the former is not a right to recovery of damages. Rather, it is a solely independent right to food, lodging and care from the onset of disability or illness to attainment of maximum recovery. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. The clear weight of authority accords maintenance and cure until the seaman is either healed or it is established that his disability or illness is permanent and maximum recovery has been achieved. Farrell v. United States, supra.
A seaman is not entitled to maintenance and cure, however, if he signs on as *434 an able-bodied seaman notwithstanding knowledge of a prior disability or conceals knowledge of a disabling disease. Tawada v. United States, 162 F.2d 615 (9th Cir.1947). Nevertheless, because of the traditional attitude of the courts towards seamen, as regards their right to maintenance and cure, the test of good faith required of a seaman to disclose known physical defects or disability is subjective in nature. In this connection we note the following applicable language appearing in Gore v. Clearwater Shipping Corporation, 3 Cir., 378 F.2d 584:
“(2-4) Apart from the general arguments against reimbursement which have been considered in Gordon, counsel for Maritime and Ocean Cargo primarily press their contention that the seaman disqualified himself from receiving maintenance and cure. The fact relied upon is the seaman’s failure to disclose material medical history at the time of the physical examination to determine his fitness for duty aboard the S S Globe Carrier. Yet there is no disagreement with the trial court that the controlling law on this point is contained in Sobosle v. United States Steel Corp., 359 F.2d 7 (3rd Cir.1966). There this court stated that ‘ * * * whether a seaman breached his duty to make it known to his prospective employer that he is unfit for service, and thus lost the right to maintenance and cure, will be determined by a subjective view of what he thought appropriate.’ 359 F.2d 7, 11. Under this standard we think that the court below committed no error in concluding that the seaman did not wilfully conceal his prior back trouble. As counsel for Clearwater and Oceanic point out, for over a year prior to the physical examination the seaman had received no medical treatment whatsoever.” (Emphasis by the Court.)
After leaving work on December 23, 1964, plaintiff was seen the next day by his family physician, Dr. Gardnell Sylvester (no relation to plaintiff), a general practitioner with considerable experience. Dr. Sylvester examined plaintiff and concluded plaintiff had sustained a ruptured intervertebral disc. Because he was not a specialist, he was able however to treat plaintiff only routinely for the attendant pain and discomfort.
Dr. Sylvester testified in effect that he had been plaintiff’s family physician for many years preceding the date of plaintiff’s reported accident. Dr. Sylvester had seen plaintiff in January, 1962, at which time plaintiff complained of backache which the doctor attributed to arthritis. On this occasion Dr. Sylvester detected no signs of a herniated disc and he referred plaintiff (a veteran) to the Veterans Administration Hospital for X-ray and therapy for arthritis. Dr. Sylvester also saw plaintiff December 24, 1964, on which occasion plaintiff related the occurrence of the incident of December 21, 1964, and complained of pain in the low back, right hip and leg. Dr. Sylvester took no X-rays but based on visual and manipulative examination found that plaintiff exhibited “positive stretch sciatic test and decrease reflex — the decrease patella and ankle reflex on the right side” which led to the conclusion plaintiff had an intervertebral disc syndrome. He advised plaintiff of his diagnosis and prescribed rest, relaxants and analgesics but plaintiff returned on December 26, 1964, complaining of the same symptoms and was administered an injection. On December 30, 1964, plaintiff again returned and upon Dr. Sylvester noting muscle spasm, plaintiff was administered another injection. The next time Dr. Sylvester saw plaintiff was January 13, 1965, at which time plaintiff related he had seen defendant’s company doctor and had returned to work for approximately two or three days when continued pain forced him to return home. Dr. Sylvester suggested plaintiff consult Dr. P. M. Davis, an orthopedist, but plaintiff returned the next day complaining of a total inability to sleep the prior night because of pain. On January 20, 1965, plaintiff again con- *435 suited Dr. Sylvester who made an appointment for plaintiff with Dr. Davis for the taking of a myelogram. On February 5, and 10, 1965, plaintiff consulted Dr. Sylvester who injected plaintiff for pain on both occasions. Thereafter Dr. Sylvester saw plaintiff February 17, March 1, March 12, May 13, July 13, August 25 and August 28, 1965, for complaints related to plaintiff’s back condition. During these latter visits Dr. Sylvester several times informed plaintiff that he, the doctor, had done all he could for plaintiff and recommended plaintiff seek forther evaluation and treatment at the Veterans Hospital. In essence Dr. Sylvester was of the opinion plaintiff sustained an intervertebral disc, herniation of mucleus pulposus of the back, which stated otherwise, is a disc syndrome requiring surgery before plaintiff could resume duties of the nature performed for Offshore. According to Dr. Sylvester, the disability noted continued at least until August 28, 1965, which is the last occasion on which the doctor treated plaintiff specifically for the back injury.
Plaintiff, a 46 year old farmer with a fourth grade education, testified in substance that in January, 1963, he went to the Veterans Hospital at Dr. Sylvester’s suggestion, for treatment of arthritis to his left leg. Thereafter, he resumed his farming operations and also accepted outside employment in December, 1963, and again in the spring and summer of 1964, during which time he experienced no arthritic symptoms. According to plaintiff, when accepted by Offshore he was, as far as he knew, in good health. Upon being notified to report for duty, he drove his own car from his home to Houma, Louisiana, and from there to Leeville, a distance of over 200 miles. At Leeville he boarded a boat for a three hour ride to the quarter boat and arrived at said destination in good health and free of pain or discomfort. The next day he twisted his back upon being thrown into a lurch by the sudden rocking of the quarter boat while standing on the edge of a lower bunk in the process of making up the upper berth. He instantly felt a warm feeling in his low back, going into his right hip and leg, but felt no pain, however, until approximately three hours later. After the onset of pain, the discomfort grew progressively worse. He worked an additional two or three days and then left for home after notifying his superiors of the accident. He acknowledged he was told by Dr. Sylvester that there was something wrong with his back but he felt it was merely a return of his former arthritis. According to plaintiff, after visiting Dr. Sylvester a few times, plaintiff felt better. When the doctor suggested that he try returning to work, plaintiff called his superior and inquired if his job was still available. Plaintiff was informed that he would have to undergo a physical examination and was referred to Dr. Roy St. Martin, Offshore’s company doctor. During the course of his examination by Dr. St. Martin, he did not mention the accident but did inform the doctor that he, plaintiff had had arthritis. Additionally, plaintiff testified that whereas he was in some pain when he reported to Dr. St. Martin, plaintiff was feeling better and believed he was able to resume his duties. Finally, he testified that upon recommencing work, his pain immediately grew worse. Despite this, he worked for some two or three days before the pain became unbearable, forcing him to leave.
Dr. P. M. Davis, Orthopedic Surgeon, testified he saw plaintiff February 1, 1965, on referral by Dr. Sylvester. Plaintiff related a history of having injured his back while making up a bunk on a boat on December 21, 1964. Plaintiff also narrated having felt pain in his low back radiating down into the right hip and foot, and complained of a stiff back upon walking or standing. Examination disclosed plaintiff had a definite list to the left and his back ■motion was restricted to the right. Flex-ion of the back resulted in pain to the lower back. X-rays disclosed disc spaces were normal and revealed no indication of disc fracture, subluxation or dislocation. Dr. *436 Davis conceded that X-rays would not necessarily show an impaired disc. Neurological tests established that ankle and knee reflexes were normal. Dr. Davis also found minimal arthritis for an individual of plaintiff’s age but did not attribute plaintiff’s complaints of pain to said condition. It was Dr. Davis’ opinion plaintiff suffered a fairly acute strain of the lumbo-sacral spine from which the patient should recover in about four to six weeks.
Dr. G. C. Battalora, Jr. examined plaintiff on August 5, 1965, at defendant’s request. Plaintiff complained of pain in the low back and right leg attributed to an accident which occurred on a boat on December 21, 1964. Predicated on extensive tests, including X-rays, Dr. Battalora found mild left dorsal, right lumbar scoliosis with a slight depression of the left pelvis. He detected some signs of voluntary restriction by plaintiff during leg raising tests but believed plaintiff was attempting to be cooperative. Dr. Battalora observed no muscle spasm and further noted that X-rays showed no evidence of fracture or dislocation. ’ In his opinion all disc spaces were normal. In Dr. Battalo-ra’s further opinion, plaintiff had sustained a lumbo-sacral sprain of limited duration and with no residual. It was his further opinion that plaintiff could resume work as of the time of the examination.
Plaintiff was examined twice by Dr. Edward T. Haslam, an orthopedic specialist, namely, on December 2, 1965, and March 21, 1967. In Dr. Haslam’s opinion very definite objective symptoms of a herniated disc were observed. On the first examination, Dr. Haslam noted muscle spasm in. plaintiff’s back and a list to the left. He found plaintiff’s paravertebral muscles did not relax in a stance phase when plaintiff walked. Dr. Haslam also noted a slight dorsiflexor weakness accompanied by atrophy of the interior tibial muscle. In addition Dr. Haslam found limitation in plaintiff’s right leg during a straight-leg raising routine. Dr. Haslam also found a flatness in plaintiff’s back which condition usually accompanies a list of the nature exhibited by plaintiff. On the second examination Dr. Haslam noted virtually the same conditions and symptoms previously observed in that he still found a list to the left and plaintiff’s complaint of pain accompanying bending to the right. On this latter occasion Dr. Haslam detected some muscle atrophy and tenderness in several areas of the low back. Dr. Haslam suggested traction followed by a myelogram in the event traction did not produce beneficial results. It was Dr. Haslam’s opinion plaintiff was disabled as of the date of the last examination and that surgery was indicated as the most reliable cure for plaintiff’s condition which was believed to be a herniated disc not necessarily discoverable through X-rays or a myelogram.
As correctly argued by defendants, despite the liberal rules governing seamen’s right to maintenance and cure, a seaman must establish his right to maintenance and cure with that degree of proof required in ordinary cases, which means more than mere speculation or conjecture. Miller v. Lykes Brothers—Ripley Steamship Company, 5 Cir., 98 F.2d 185. We find no merit, however, in defendants’ contention that plaintiff has failed to bear the burden of proof in the case at hand. This position is based primarily on the fact that plaintiff did not relate the occurrence of the accident either to Dr. St. Martin on January 7, 1965, or plaintiff’s superiors, Jim Ledet and John W. Pitre. In this connection it appears plaintiff concedes he did not mention a back injury to Dr. St. Martin because on the date of Dr. St. Martin’s examination, plaintiff was feeling somewhat better and thought that the trouble which commenced December 21, 1964, was a return of the arthritis experienced in 1963. Plaintiff, however, testified that on the day following the incident he told Pitre of the occurrence and also informed Pitre that plaintiff thought his pain was due to a recurrence of arthritis. Needless to say, both Pitre and Ledet deny plaintiff told them plaintiff had had an accident of any *437 nature. In substance both said parties testified that plaintiff did tell them he was having back trouble which plaintiff attributed to arthritis. We find, however, the evidence preponderates to the effect that plaintiff, upon returning home, told Dr. Sylvester of the incident aboard the quarter boat and likewise informed Drs. Davis, Battalora and Haslam.
We share the view of the trial judge that plaintiff is suffering from a disabling herniated intervertebral disc, or at least a severe low back syndrome incurred while in the service of defendant’s vessel. Admittedly, the medical evidence is conflicting but, weighed as a whole, we find it preponderates in plaintiff’s favor. Granted that Dr. Sylvester is not a specialist but, as treating physician who has seen plaintiff on numerous occasions since the accident, nevertheless his opinion is entitled to considerable weight. From the initial examination he found definite objective symptoms of herniation which were reobserved on virtually every subsequent examination. Confirmation of this diagnosis by Dr. Haslam in December, 1965 and March, 1967, likewise predicated on objective findings, is sufficient to make out plaintiff’s case. It is of further worthy note that while defendants maintain plaintiff’s condition is merely a return of the arthritis experienced in late 1962 and early 1963, plaintiff’s original arthritis was in the left side and leg. It is clear from the record that upon discharge from the Veterans Hospital in January, 1963, where he was treated for arthritis in the left leg, plaintiff suffered no significant discomfort or pain until after the incident of December 21, 1964, and thereafter, until the present time, plaintiff’s pain has been in his low back, right thigh and leg.
Nor do we find any merit in defendant’s charge that plaintiff has forfeited his right to maintenance and cure because of willful and deliberate concealment or misrepresentation of a known physical disability or disease. In this connection, it must be remembered that the test is subjective which means that to bar the seaman, he must have knowingly and fraudulently concealed the disability or disease. Dragich v. Strika, supra.
The present record establishes beyond doubt that plaintiff was in apparent good health for at least a year preceding his employment by Offshore. During said interval plaintiff’s arthritis was in a state of dormancy in that plaintiff carried on his normal duties about his farm and also did outside work for two employers, both of whom required prior physical examinations, without complaint of serious pain. In addition, during said interim, plaintiff never consulted his family physician concerning plaintiff’s prior arthritis. Also significant is the fact that Offshore did not require plaintiff to undergo physical examination preceding plaintiff’s employment. While the record does show plaintiff filled out an application blank prior to his employment on which he answered “no” to a question asking whether he was afflicted with any disability or disease, said circumstance is a matter of no moment. The record is clear that when plaintiff so responded to the inquiry, plaintiff had every reason to believe he was in good health. It is also immaterial that plaintiff failed to disclose to Dr. St. Martin that plaintiff sustained an accident on December 21, 1964. It is inconsequential first because plaintiff had already been engaged without benefit of physical examination. Secondly, the record as a whole establishes that in plaintiff’s own mind he was healthy and able to work when initially employed by Offshore and that, upon reporting to Dr. St. Martin, he was of the honest conviction he had sufficiently recovered from what he believed to be another bout of arthritis.
The contention that plaintiff should be denied recovery because of his failure to avail himself of the facilities of the Veterans Hospital is also deemed without basis. That plaintiff has sought medical relief repeatedly from his local physician is *438 apparent from the record. It further appears that when advised by Haslam that surgery was indicated, plaintiff exhibited a willingness and readiness to submit thereto for relief. That plaintiff has not sought further normal therapy does not terminate his right to benefits herein. The testimony of Doctors Sylvester and Haslam clearly reflects that plaintiff’s difficulty can, in all probability, only be alleviated by surgery. At no time has Offshore extended plaintiff any offer of treatment whatsoever. On the contrary, it has been defendant’s position from the outset that plaintiff was entitled to no benefits at all. Consequently, defendant offered none.
Next we consider the complaint that the trial court awarded plaintiff judgment without presentation of itemized proof of the value of the food and lodging received as an incident to plaintiff’s employment.
The principle governing this issue is set forth in Hudspeth v. Atlantic & Gulf Stevedores, Inc., D.C., 266 F.Supp. 937, as follows:
“The amount of maintenance to which an injured seaman is entitled is a factual question. Some courts have measured it by the amount necessary to provide meals and lodging ashore of the same character that were furnished aboard ship; but other authorities say the amount is to be based on proof of the seaman’s out-of-pocket expenses. Maritime union contracts frequently fix the daily maintenance rate and this rate is usually applied to seamen covered by the contract. At last (sic) one text writer says that ‘even if there is no union rate applicable to a particular case, a court may take judicial notice of the amount fixed by union agreements in the area.’ Courts have sometimes considered the union contract rate as persuasive of the reasonableness of the sum fixed when it is not directly applicable, or as admissible evidence in the absence of other proof, or as at least one factor tending to show the reasonable value of maintenance.
“The Court of Appeals for the Fifth Circuit has said that ‘the seaman’s recovery must be measured by the reasonable cost of that maintenance and cure to which (the plaintiff) is entitled at the time of the trial.’ United States v. Robinson, 5th Cir. 1948, 170 F.2d 578. This means the reasonable cost of meals and lodging ashore of a type that the injured seaman would normally require.”
Moreover, it is well established that the liability of the shipowner for maintenance and cure, being among the most pervasive of all, is not to be restrictively construed and confined. Contrarily, said obligation is to be liberally construed in favor of the seaman in whose favor all ambiguities or doubts shall be resolved. Vaughn v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88.
The maintenance due a seaman being cured, takes the place of his sustenance, of the standard of quality to which he is entitled while aboard ship. Norris, The Law of Seamen, Section 540, page 586. The trial court, relying on the holding in Hudspeth v. Atlantic and Gulf Stevedores, Inc., supra, that judicial notice may be taken of the factors determinative of maintenance and cure awards, and of the wards themselves, in the pertinent geographical area, fixed plaintiff’s award at $8.00 daily. In so doing, the trial court rested upon Sims v. Marine Catering Service, D.C., 217 F.Supp., page 511, and Theriot v. Aetna Casualty & Surety Co., D.C., 215 F.Supp. 36, wherein $8.00 per day was held reasonable for maintenance of seamen living on vessels serving the offshore drilling industry, absent evidence to the contrary. Under such circumstances we can find no abuse of the discretion vested in the trial court in such matters and affirm the award.
Also without merit is the contention that the award should be limited to the *439 number of days plaintiff worked each month. The basis of this position is that since plaintiff worked 14 days on and 7 days off, maintenance and cure should be reduced to a sum equal to fárds of the sum to which plaintiff would be entitled if he worked each and every day.
Weiss v. Central Railroad Company of New Jersey, 2 Cir., 235 F.2d 309, appears to express the clear majority view that the traditional privileges attending the right to maintenance and cure benefits are not to be reduced, restricted or curtailed because the seaman sleeps ashore, or because his tour of duty is brief or because of any extra comforts or facilities furnished by the employer while the seaman is aboard ship. It is immaterial, therefore, that plaintiff was extended considerable time off. We can readily perceive that it was to Offshore’s advantage to offer such a concession to obtain personnel to work under circumstances which would involve prolonged separation from their families. Defendants, however, rely upon Alexandervich v. Gallagher Bros., 298 F.2d 918, wherein similar award was limited to the time the seaman spent on the vessel. It appears, however, the Alexandervich case, supra, stands alone in the jurisprudence and is contrary to the legion of cases supporting the view expressed in the Weiss case, supra. See also Hudspeth, supra, and authorities therein cited.
There remains the question of attorney’s fees awarded in the sum of $2,-700.00. That defendant had notice of the onset of plaintiff’s sickness while plaintiff was in defendant’s employ, is patent on the face of the record. Offshore’s personnel manager, Ledet, and its steward, John W. Pitre, concede that plaintiff advised them that plaintiff’s arthritis had become active while aboard the vessel. Ledet also acknowledged he was required to secure a replacement for plaintiff following plaintiff’s first departure on December 24, 1965. Additionally, by February 10, 1965, Offshore was in receipt of reports from Dr. Sylvester advising that plaintiff was disabled due to an ailment which, in Dr. Sylvester’s opinion, originated while plaintiff was aboard Offshore’s vessel. Assuming there was no accident, as defendants contend, plaintiff was nevertheless entitled to maintenance and cure even though a dormant, pre-existing arthritic condition became activated while plaintiff was in Offshore’s employ aboard its vessel. Plaintiff need only establish that he became ill aboard the vessel, not that he experienced a disability producing accident. Connorton v. Harbor Towing Co., D.C., 237 F.Supp. 63. Under the circumstances shown, defendants were correctly held by the trial court to have been lax in investigating plaintiff’s claim and to have acted arbitrarily and unreasonably in totally withholding any proffer of benefits. We therefore find the award of attorney’s fees reasonable and justified.
Accordingly, the judgment of the trial court is affirmed at appellants’ costs.
Affirmed.